AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Kansas

**FILED**
**U.S. District Court**
**District of Kansas**
03/20/2026
**Clerk, U.S. District Court**
By:__MV__**Deputy Clerk**

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)
A gray Samsung, unknown model, unknown serial number, seized )
from Shelby Wilson's person, currently located at KBI Field )
Office, 2501 Campus Dr., Ste. 900, Garden City Kansas 67846, )
further described on Attachment A )

Case No.  26-M-_6076__-01-BGS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

A gray Samsung, unknown model, unknown serial number, seized from Shelby Wilson's person, currently located at KBI Field Office, 2501 Campus Dr., Ste. 900, Garden City Kansas 67846, further described on Attachment A

located in the _____ District of _____Kansas_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C.§§ 2251A(a), 2252A(a)(2), 2252A(a)(3)(B), 2252A(a)(1), 2252A(a)(5)(B) | Production of child pornography; Distribution/Receipt of child pornography; Distributes or solicits child pornography; Transportation of child pornography; Possession of child pornography |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Mark Johnson, TFO, United States Secret Service
*Printed name and title*

Sworn to me and signed via Zoom.

Date:    3/20/2026

City and state:  Wichita, Kansas

_____
*Judge's signature*

Honorable Brooks G. Severson, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF KANSAS

IN THE MATTER OF THE SEARCH OF
**GRAY SAMSUNG, UNKNOWN MODEL,
UNKNOWN SERIAL NUMBER, SEIZED
FROM SHELBY WILSON'S PERSON,**
CURRENTLY LOCATED AT **2501 N
CAMPUS DR SUITE 900, GARDEN
CITY, KANSAS 67846**

Case No. ___26-6076-01-BGS___

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **TFO Mark Johnson**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a TFO with the United States Secret Service, and have been since 2020. I am a Special Agent with the Kansas Bureau of Investigation, and have been since October 2019. Prior to employment with the KBI, I was employed with the Garden City Police Department (GCPD) beginning June 2001. I held different titles while employed to include Patrol Office, Master Patrol Officer (MPO), Field Training Office (FTO), Detective, Senior Detective, Special Agent (SA) and currently Senior Special Agent (SSA). During my time with the Kansas Bureau of Investigation I have also been assigned to the United States Secret Service (USSS) and a Task Force Officer (TFO). At the time of my employment ending with the Garden City Police Department (GCPD), I have investigated many different felony cases to include Crimes against Children and Internet

Crimes against Children (ICAC). I have completed numerous investigations regarding felony person and nonperson crimes, to include, but not limited to, Homicide, Rape, Aggravated Assault, Aggravated Robbery, Domestic Violence, and Crimes against Children. I am a certified law enforcement officer in the State of Kansas. My total experience in law enforcement is over 25 years. In my capacity as a law enforcement officer, I have been trained to handle, and forensically examine digital data to include but not limited to computers, cellular devices, storage media, Random Access Memory (RAM), vehicles, video and audio. I have routinely examined digital media from Electronic Service Provider's and COMPUTERs, to include cellphones and social media accounts. As a law enforcement officer, I have applied for and executed numerous search warrant for residences and other structures as well as all types of electronic devices. I have attended numerous trainings, certification courses, and conferences throughout the course of my law enforcement career. Some of that training, experience, and information has been used while conducting investigative work on the case referenced in this affidavit. Some of the relevant trainings may include, but are not limited to, the following: Kansas Law Enforcement Training Center, Homicide, Human Trafficking, Sexual Deviant Offenders, Child Death Investigations, Child First, Dark Web, KBI Training Academy, Child Abuse, Child Sexual Abuse, and Internet Crimes against Children (ICAC). The training received has been provided through such agencies as Federal Law Enforcement Training Center (FLETC), National Computer Forensic Institute (NCFI) and many others listed in my curriculum vita provided upon request.

3.    The statements in this Affidavit are based on police reports, statements and information provided by other law enforcement officers involved in this investigation, and from my own observations made during the investigation. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known

2

to me concerning this investigation. I have set forth only the facts that they believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of the federal violations listed below are located within the electronic device described in Attachment A.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.    This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure in support of a search warrant for a **Gray Samsung, unknown model, unknown serial number,** seized from Shelby Wilson's "**WILSON**" person, (hereinafter "**DEVICE 1**") and a **Gray Samsung, unknown model, unknown serial number** sized from **WILSON**'s residence (hereinafter "**DEVICE 2**"). **DEVICE 1** and **DEVICE 2** are currently in the forensic faraday box located in the Kansas Bureau of Investigation (KBI) Field Office located at 2501 Campus Drive, Suite #900, Garden City Kansas 67846.

5.    The applied-for warrant would authorize the forensic examination of the Device(s) for the purpose of identifying electronically stored data particularly described in Attachment B.

## STATUTORY AUTHORITY

6.    This investigation concerns alleged violations relating to material involving the sexual exploitation of minors. More specifically violations of 18 U.S.C. § 2251A(a) (production of child pornography); 18 U.S.C. § 2252A(a)(2) (distribution/receipt of child pornography); 18 U.S.C. § 2252A(a)(3)(B) (distributes or solicits child pornography); 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); 2252A(a)(5)(B) (possession of child pornography):

        a.   18 U.S.C. § 2251(a) prohibits persuading, inducing, enticing or coercing any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate commerce with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing child pornography.

3

b. 18 U.S.C. § 2252A(a)(2) prohibits knowingly receiving or distributing any child pornography that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

c. 18 U.S.C. § 2252A(a)(3)(B) prohibits promoting, presenting, distributing, or soliciting any material or purported material in a manner that reflects the belief, or that is intended to cause another to believe that the material or purported material is or contains obscene visual depictions of a minor engaging in sexually explicit conduct or visual depictions of an actual minor engaging in sexually explicit conduct.

d. 18 U.S.C. § 2252A(a)(1) prohibits knowingly transporting child pornography using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mail.

e. 18 U.S.C. § 2252A(a)(5)(B) prohibits knowingly possessing, or accessing with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

7. The following definitions apply to this Affidavit and Attachment B:

f. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

g. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

4

h.  "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

i.  "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

j.  "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units; internal and peripheral storage devices such as fixed disks; external hard drives; "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer; and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

k.  "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

l.  "Hyperlink," as used herein, refers to an item on a web page or in a mobile application which, when selected, transfers the user directly to another location in a hypertext document or to some other web page or (part of) a mobile application.

m.  "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

5

n.  An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

o.  The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

p.  "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

q.  "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

r.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

s.  A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks; RAM; "thumb," "jump," or "flash" drives; CD/DVDs; and other magnetic or optical media.

t.  "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

u.  "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

**PROBABLE CAUSE**

8.        The National Center for Missing and Exploited Children (NCMEC) maintains a system for the submission of information related to missing children and children being exploited through means of the internet. The system is also utilized for Electronic Service Provider's (ESP) to report users for the production, possession, and distribution of Child Sexual Abuse Material (CSAM). The tips generated are referred to as CyberTipline Reports (CTR) that are further assigned to different Internet Crimes Against Children (ICAC) taskforces across the United States. The Google user account shells25bish@gmail.com reported by Google is under the care and control of Google. The facts listed below show the account uploaded videos and images of CSAM to Google's server via the account.

9.        On 03/04/2026, the KBI received NCMEC CTR 231111093 reference the production and possession of CSAM occurring in Cimarron, Gray County, Kansas. ESP Google submitted the CTR to NCMEC, due to a user uploading CSAM from a device to the server. Google's server is located outside of the State of Kansas, 1600 Amphitheater Parkway, Mountain View, California. CTR 231111093 indicated some of the uploaded files were "Apparent Child Pornography" that appeared to be "Homemade" and/or "Newly Produced".

10.       Google submitted several NCMEC CTR's linked to CTR 231111093 (CTR 230630254, 230699828, 230706647, 230718961, 230727697, 230789154, 231030697, 231030691, 231110642, and 231122977) containing the account user information and the media file information for the uploaded CSAM. The account display name was listed as "Shells CALLUM", with verified Verizon Wireless phone number 620-255-6832, date of birth 05/20/1988, and verified email address shells25bish@gmail.com. The information provided indicated the associated email address changed to shells2026bish@gmail.com on 03/01/2026.

11.     Google submitted login and IP Address information for user account shells25bish@gmail.com with NCMEC CTR 231111093. The login information dated back to 11/21/2025 at 02:38:48 UTC with UTA IP Address 68.70.41.19. On 03/01/2026 at 01:21:44 PST, Google showed additional account shells2026bish@gmail.com as a user.

12.     Google provided the uploading device information as a Samsung Model A36 SM-S366V, 5G, IMEI 350987120288315, Serial a36xq:RFCY323L4YV, with user accounts, shells25bish@gmail.com and shells2026bish@gmail.com.

13.     Law Enforcement downloaded and viewed media files submitted with the NCMEC CTR's.    Media file    Google-CT-RPT-231110642-156030c03aac9781a55dd2aede8972a3-20260107_173040.mp4 submitted with NCMEC CTR 231110642 was a video depicting the female genitalia of Minor Victim 1 and the hand of an adult white male touching the genitalia of Minor Victim 1. Law Enforcement estimated Minor Victim 1 to be under 4 years of age based on Minor Victim 1's body structure and the development of the genitalia. A distinct marking is present on the genitalia of Minor Victim 1. The fingers and fingernails of the adult male were distinct. The fingers and fingernails of the adult male were displayed and distinct, which would ultimately aid in identification. The fingernails were unkempt, some of the nails being longer. The fingernails had black fingernail polish that was chipped. The visible fingers appeared to have some scarring present which defined the upper knuckles of the middle and ring fingers in a distinct way.

14.     Based on the metadata, it appeared the file was created 01/07/2026. The file was uploaded 02/16/2026 at 02:00:29 UTC utilizing United Telephone Association (UTA) Internet Protocol (IP) Address 68.70.41.19. This IP address returns to a residential IP Address in the area of Cimarron, Gray County, Kansas. Law Enforcement knows that **WILSON** resides at 307 N Ash, Cimarron, Kansas 67835 which is a single occupancy dwelling. Through my training and

8

experience, the data received from Google showing the IP address is believed to be associated with Wilson.

15.    Media file Google-CT-RPT-230706647-05fb50eb4162af4bb536868846e04aa3-20260119_155304.mp4 submitted with NCMEC CTR 230706647 was a video depicting the female genitalia of Minor Victim 1 sitting on a toilet. Based off of statements made in the video, it appeared Minor Victim 1 was learning to toilet train. The same distinct adult male hand reaches down in between the legs of Minor Victim 1, touches and spreads the genitalia. Prior to the video ending, the camera angle moves to the side away from Minor Victim 1, making the floor visible. The floor was unique. The subfloor could be seen in spots where either the linoleum or tile was no longer secured in place. Based on the metadata, it appeared the file was created 01/19/2026. The file was uploaded 02/16/2026 at 01:57:27 UTC utilizing same UTA IP Address.

16.    Media file Google-CT-RPT-230706647-2ce38caa02fca6b90c42b7e1e091428b-20260107_173100.jpg submitted with NCMEC CTR 230706647 was an image of the genitalia of Minor Victim 1 with the same distinct adult male hand touching and spreading the genitalia. Based on the metadata, it appeared the file was created 01/07/2026. The file was uploaded 02/16/2026 at 01:51:26 UTC utilizing the same UTA IP Address.

17.    Media file Google-CT-RPT-230727697-b9e606ed38615e57c7b094f1bfea209a-20260107_173032.jpg is an image of the genitalia of Minor Victim 1. Based on the metadata, it appeared the file was created 01/07/2026. The file was uploaded 02/16/2026 at 01:51:28 UTC utilizing the same IP Address.

18.    Google, on its own accord, provided information located within the user account with the NCMEC CTR's in order to aid in the identification of Minor Victim 1 and the adult male. The additional media files provided included images from Facebook accounts and additional

9

photographs. Some of the photos taken registered the IP address from the preliminary data received from Google, as being within a few blocks from 307 N. Ash, Cimarron, Kansas 67835 where Wilson is known to live. Law Enforcement also compared the information with a known Kansas Driver's License photo.

    a. Media file Google-CT-RPT-231110642-07c1358df57d6d9e50a10370547f53ea-20251228_134117.jpg is an image of a male identified as WILSON. In the image, WILSON has his arm around a female identified as CAISSA ALEXI SITZMAN. WILSON's hand is visible in the image. WILSON'S hand had the same distinct fingernails, unkempt in the same manner, the same chipped black nail polish and distinct scarring on his knuckles as the adult male hands observed in three (3) of the four (4) media files of CSAM described above. The media file was uploaded 01/27/2026 at 11:22:56 UTC utilizing the same UTA IP Address as the four (4) media files of CSAM.

    b. Media file Google-CT-RPT-231110642-954b636417b1c2509c41c28e39750cfd-IMG_20251228_100606(4).jpg is an image of WILSON and SITZMAN. The GEO EXIF indicated the image was taken in Cimarron, Gray County, Kansas. The media file was uploaded 01/27/2026 at 11:23:36 UTC utilizing the same UTA IP Address as the four (4) media files of CSAM. This assisted in confirming for law enforcement that WILSON was residing in Cimarron, Kansas and utilizing the same IP Address as the four (4) media files of CSAM.

    c. Media file Google-CT-RPT-231110642-2acb12b4ccc5042af6e04b77d4467fc2-Screenshot_02251126_215356_Chrome.jpg is a screenshot of OnlyFans.com adding a card with the information of shells25bish@gmail.com with the name of

Shelby WILSON and an address listed in Kansas City, 66102. The media file was uploaded 11/26/2025 at 18:34:20 UTC utilizing the same UTA IP Address as the four (4) media files of CSAM. This email address is one Google associated with the four (4) media files of CSAM and can be tied as being utilized by WILSON.

d.   Media file Google-CT-RPT-231110642-c8bc0e106dde78cebf4f75217629d3f4-2f33c9f7-dfd3-43e7-b6bc-3bdb3143a23c.mp4 is a video of WILSON and SITZMAN with a female minor child and a male minor child under the age of 5. The media file was uploaded 01/27/2026 at 11:30:12 UTC utilizing the same UTA IP Address as the four (4) media files of CSAM.

e.   Media file Google-CT-RPT-231110642-285a0b8ecda4abbda88e92c9ca5643721-IMB_20251228_100606.heic is an image of WILSON sitting with a female minor child under the age of 4. The media file was uploaded 01/27/2026 at 11:23:28 UTC utilizing the same UTA IP Address as the four (4) media files of CSAM.

19.   The CTR's identified Meta Platforms Inc. the following Facebook account:

a.   https://www.facebook.com/shelbs.wilson and

b.   https://www.facebook.com/profile.php?id=61585295396391

as being attached to shells25bish@gmail.com. The Facebook account has the display name of "Shelbs Wade Wilson Poole". The account showed a location of Cimarron, Kansas. The account display photographs of minor children under the age of 5.

20.   Google provided additional IP Address login information for the account. From 11/01/2025 to 02/24/2026, numerous logins occurred in the State of Kansas and Missouri. Thirty-seven (37) logins were documented for residential UTA IP Address 68.70.41.19 located in Cimarron, Gray County, Kansas.

11

21.     On 03/06/2026, Law Enforcement provided additional information regarding WILSON. Law Enforcement had contact with WILSON on 02/19/2026 at PREMISES for Domestic Violence (DV) involving SITZMAN (Gray County Sheriff's Office 26-99). WILSON was lodge for DV. WILSON provided phone number 620-640-0895 to Law Enforcement. WILSON bonded out on 02/21/2026. At the time of booking, WILSON had a Samsung cell phone that was placed into his property and later released to him upon bonding out. Law Enforcement indicated WILSON didn't want the cell phone he possessed removed from him during prior contacts and the recent contact from him during the contact.

22.     On 03/06/2026, Kansas Department for Children and Family (DCF) identified two (2) of the minor children observed in the Facebook accounts as belonging to SITZMAN and WILSON. The minor children were confirmed to be 4 years of age and under.

23.     On 03/15/2026, the Honorable United States Magistrate Judge Brooks G. Severson granted a search warrant, 26-M-6068-01-BGS, for 307 N Ash, Cimarron, Kansas, and an arrest warrant, 26-6069-01-BGS, for **WILSON**.

24.     On 03/17/2026 at approximately 11:25 AM, Law Enforcement executed the search warrant at 307 N Ash, Cimarron, Kansas. At approximately 11:27 AM, Law Enforcement had contact with **WILSON** and he was placed in custody. **WILSON** was located with a Samsung cellphone on his person (**DEVICE 1**). The cellphone was removed from his person and turned over to additional Law Enforcement on scene. The cell phone was placed into a faraday bag. Two (2) additional Samsung cellphones were located in the basement. Both cellphones were in the direct area of WILSON's property. One (1) of the cellphones appeared to be a Samsung A-10. This cellphone was identified as being used as a medical device. The other was gray in color with the word Samsung displayed (**DEVICE 2**). No other visible markings were present.

12

25.    **WILSON** was transported to the Gray County Sheriff's Office, 300 S Main St, Cimarron, Kansas, and placed into an interview room. KBI Special Agent Vanessa Hahn and United States Secret Service Agent William Tidball conducted the interview with **WILSON**. Prior to conducting the interview, SA Hahn advised **WILSON** he was in custody for possession of child pornography. SA Hahn read **WILSON** his rights per Miranda. **WILSON** advised he understood his rights at 1:08 PM and agreed to speak without an attorney present. The following is some of the information provided or observed during the execution of the search warrant and the interview.

a.    Law Enforcement had legal authority granted to enter and remain at WILSON's residence, 307 N Ash, Cimarron, Kansas. During the execution, SA Hahn observed the residence had one bathroom. SA Hahn identified the bathroom to be the same bathroom observed in Media file Google-CT-RPT-230706647-05fb50eb4162af4bb536868846e04aa3-20260119_155304.mp4 submitted with NCMEC CTR 230706647.

b.    **WILSON**'s left hand had the same scarring as observed in three (3) of the CSAM files. **WILSON**'s fingernails were unkempt and he had chipped black nail polish on the some of the nails on his left hand. **WILSON** indicated he commonly shellacs his fingernails with the color black.

c.    **WILSON** indicated he changed his Google account every few to 6 months. **WILSON** stated he kept changing the Google account, due to being "hacked" and media showing up that he didn't want to see. **WILSON** also stated he changed Google accounts because he kept getting locked out of the accounts.

d.    **WILSON** advised he frequently went to a Russian website for "gaming". **WILSON** stated he would see images of children wearing night gowns.

13

WILSON advised he was aroused by the images of "beautiful" young girls 8, 9, and 10 years of age, with one being approximately 13 years of age. **WILSON** described the attraction as "Preadolescent Sensuality". **WILSON** stated he has gone to the website more than 100 times, but less than 1000 times. **WILSON** indicated he has screenshots of media files and also downloaded some of the media files. **WILSON** stated he knew looking at the media files were wrong and that if he had access to the sites then others did as well. SA Hahn knows the information WILSON provided regarding the children being in night gowns to be false. SA HAHN viewed the media files uploaded to the Google account [shells25bish@gmail.com](mailto:shells25bish@gmail.com). The media files depicted female prepubescent and pubescent minors, in lingerie and various different stages of nudity.

e. **WILSON** advised he helped change diapers and potty train Minor Victim 1, along with an additional minor male. **WILSON** stated Sitzman was the mother of the two (2) minor children. **WILSON** advised he commonly watched the children for Sitzman, without her present. **WILSON** indicated the children were at the residence approximately 15 to 20 times.

f. **WILSON** advised he took images of Minor Victim 1's genitalia. **WILSON** stated he did this to show Sitzman to find out if Minor Victim 1 had a yeast infection. **WILSON** advised he did not send the images to Sitzman, but waited for her to return home and then showed it to her. **WILSON** denied taking a video of the genitalia of Minor Victim 1. **WILSON** advised he did take a video of Minor Victim 1 when she was potty training, to send to Sitzman, but never showed anything other than her face. When confronted about inconsistencies in

14

statements and the statements not making sense for the information he was providing, **WILSON** would state he didn't remember and blame his epilepsy. SA Hahn knew the statements made to be false, due to observing the media files of **WISON** and Minor Victim 1 in the bathroom.

g.  **WILSON** provided several Google accounts that he has utilized, shells25bish@gmail.com and shells2026bish@gmail.com were two of the most recent. **WILSON** advised his prior phone number was 620-255-6832, the same phone number listed with the NCMEC CTRs. **WILSON** stated he changed his phone number approximately 2 weeks ago due to getting locked out of his account, shells25bish@gmail.com. **WILSON** changed his email to shells2026bish@gmail.com. **WILSON** was unable to provide his new phone number.

h.  **WILSON** knew media files taken or saved to the device would upload to Google's servers. **WILSON** understood how electronics worked. **WILSON** denied distributing any of the media files depicting CSAM.

26.    The Device is currently in the lawful possession of the Kansas Bureau of Investigation. It came into the Kansas Bureau of Investigation's possession in the following way: On March 17, 2026, those items were transferred to Senior Special Agent Mark Johnson with the Kansas Bureau of Investigation (KBI) who is also assigned to the United States Secret Service (USSS) and a Task Force Officer (TFO). Therefore, while the Kansas Bureau of Investigation might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

15

27.     The Device is currently in storage at Kansas Bureau of Investigation (KBI) Field Office located at 2501 Campus Drive, Suite #900, Garden City Kansas 67846. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Kansas Bureau of Investigation (KBI).

28.     The nature of the files possessed by **WILSON** consist of CSAM with multiple different victims, as well as the various locations over the course of several dates establish that, in my training and experience, **WILSON** is a habitual offender and likely to continue these activities on **DEVICE 1**.

29.     Courts have recognized that the majority of Americans possess and use cellular telephones, and that most of those keep the phones within their reach at all times. Cellular telephones are used for, among other things, voice, text, email, and SMS communications; accessing and posting to social networking websites, surfing the internet, taking, and storing photographs, creating, and storing documents, notes, music, mapping directions to places, etc. Courts have recognized that these devices are essentially small computers with vast storage capacities.

30.     Possessors of child pornography can use cellular and wireless devices to upload and download images. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography.

31.     Online services, sometimes referred to as cloud storage, allow a user to set up an account with a remote computing service that provides e-mail services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer or mobile device with access to the internet. Such stored data can be retrieved from the

16

online service by any computer or mobile device with access to the internet and authorized access to the account. Evidence of such online storage of child pornography is often found on the user's computer or mobile device.

32.    Individuals engaged in the production, procurement, trade, and/or transmission of child pornography through computer or other interstate conveyance most often do not discard the child exploitation material, but collect it over a long period of time and maintain this material in the privacy of their homes and/or on electronic devices or storage media. However, sometimes individuals possessing child pornography will engage in a routine where they may delete their child exploitation material after they have viewed it, and then after the deletion occurs the individual will replenish their supply when they desire more images to satisfy their sexual interest in children. This procurement and purging cycle generally results in evidence of their current child pornography images being located on their computer/electronic devices/storage media as well as evidence of their deleted material still remaining on such which may be recovered by a forensic examination.

33.    Due to the facts presented above, I believe that it is probable that **DEVICE 1**, further described in Attachment A, contains additional contraband and evidence, fruits, and instrumentalities, further described in Attachment B, 18 U.S.C. § 2251A(a) and (b) (production of child pornography); 18 U.S.C. § 2252A(a)(2) (distribution/receipt of child pornography); 18 U.S.C. § 2252A(a)(3)(B) (distributes or solicits child pornography); 18 U.S.C. § 2252A(a)(1) (transportation of child pornography); 2252A(a)(5)(B) (possession of child pornography) and respectfully request that a search warrant be issued for **DEVICE 1**.

17

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

34.     Based on my experience in the investigation of computer-related crimes and the discussions I have had with other investigators who have experience in investigations related to child exploitation, I know the following:

   a. Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

   b. Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone, or transferred to external storage devices, such as a USBC. These memory cards and USBC devices are often large enough to store thousands of high-resolution photographs or videos.

   c. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

   d. A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

18

e.  The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.  Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.  A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

h.  As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

35.  Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who possess and access online child sexual abuse and exploitation material:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals almost always possess and maintain child pornographic material in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain those materials and child erotica for many years.

d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

f. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g. online messaging accounts, email addresses, etc.) of individuals with whom

---

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

they have been in contact and who share the same interests in child pornography.

g.  Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.  In my training and experience conducting child exploitation investigations, I am aware that persons who receive, possess, and distribute images of child pornography sometimes utilize email accounts and online "cloud" storage to correspond with other persons sharing similar interests; and that those persons sometimes utilize those email accounts and online "cloud" storage to receive, transmit and store images of child pornography. Cloud-based storage can be utilized by child pornography distributors/possessors to add a layer of anonymity to their actions, as well as attempt to conceal the trading and collecting of child exploitation material from law enforcement.

36.  I submit that there is probable cause to believe those records referenced above will be stored on that electronic device or storage medium, for at least the following reasons:

a.  Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is

21

typically required for that task. However, it is technically possible to delete this information.

 d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the item listed in Attachment A because:

 a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

 b. Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers

22

typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

23

f.  I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

38.    Based upon my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I know that during searches, it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.  Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b.  Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

24

c.  The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.  Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

39.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## TECHNICAL TERMS

40.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones

25

or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

c. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be

assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

d. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

41.   Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.phonescoop.com/, I know that the Samsung devices, as described in this affidavit, have capabilities that allow them to serve "a wireless telephone, digital camera, portable media player, GPS navigation device, external media storage and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

42.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time and the device(s) can accesses the internet. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

43.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of microSD flash storage devices or other external storage media.

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

44.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

45.    *Manner of execution.*    Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

46.    I submit that this affidavit supports probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence,

29

fruits, and instrumentalities of these offenses, more fully described in **Attachment B**, are located in or at the location described in **Attachment A**. I respectfully request that this Court issue a search warrant for the location described in **Attachment A**, authorizing the seizure and search of the items described in **Attachment B**.

Respectfully submitted,

MARK JOHNSON
Task Force Officer
UNITED STATES SECRET SERVICE

Subscribed and sworn to before me
on March __20__ , 2026.

HONORABLE BROOKS G. SEVERSON
UNITED STATES MAGISTRATE JUDGE

30

## ATTACHMENT A

### DEVICE TO BE SEARCHED

**Gray Samsung, unknown model, unknown serial number** (hereinafter "**DEVICE 1**") seized from Shelby **WILSON's** person on or about March 17, 2026 and currently in the possession of TFO Mark Johnson located in the forensic faraday box located in the Kansas Bureau of Investigation (KBI) Field Office located at 2501 Campus Drive, Suite #900, Garden City Kansas 67846.

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED**

1.      Any and all child pornography (as defined in 18 U.S.C. § 2256(8)), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

2.      Any and all child erotica, including documents, writings, and images or videos of children that do not qualify as child pornography but evince a sexual interest in children.

3.      Any and all software, applications, computer related documentation, and passwords, that may be or are used to:

4.   produce, distribute, receive, possess or access child pornography or visual depictions of minors engaged in sexually explicit conduct;

5.   seek, obtain, store, or record information pertaining to the sexual exploitation of children or otherwise relate to an interest in child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children; and

6.   communicate with any other person regarding child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children.

7.      Any and all data or information on the device, which may reveal indicia of ownership, access, or use of the account and websites described in the attached affidavit.

8.      Any and all notes, documents, records and correspondence pertaining to child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children, and to include any and all data or records that may reveal indicia of creation, use, or ownership of the notes, documents, records, or correspondence.

9.      Any and all documents, records, or correspondence that concern any accounts with an Internet Service Provider.

10.      Any and all records, documents, invoices and materials that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

11.     Any and all records, documents, invoices and materials that concern encryption, deletion, or destruction of evidence.

12.     Any and all visual depictions of minors that may assist in the identification of minors depicted in images of child erotica or child pornography.